The first case this morning is Energy Future Holdings Corp., who shall approach. Good morning, Your Honor. Good morning. May it please the Court, Howard Seif from the law firm of Norton Rose Fulbright for the appellant, NextEra Energy, Inc. So Mr. Jaworski was pushed out, at least name-wise? He still lives in memory, Your Honor. Yes, he does. But thank you. Go ahead, please. With the leave of court, I'd like to reserve two minutes. Of course. Thank you very much. This appeal arises from an extraordinary order of the Bankruptcy Court. The word extraordinary is not mine. The court itself used that term three times during the course of its opinion. It recognized that its ruling was extraordinary. Well, it said extraordinary circumstances, correct? Is that the context? Extraordinary circumstances? I think he found it, putting myself in the court's mind, that it was extraordinary that after a year, he was vacating an order which he rendered, which he knew NextEra had relied upon. And he recognized in his opinion that NextEra had expended tens of millions of dollars in reliance on that order. You say after a year, but it wasn't a year after he entered the order, was it? Yes, it was. It was exactly a year that he vacated it. Exactly. He entered the order, and it was exactly a year later that he reconsidered it? Yes, to the day, which is curious. The motion seeking to vacate it was 10 months after the fact. And the judge below considered this issue of timeliness, and he said that the issue was not ripe until 10 months later to challenge his initiative. Well, let me ask you this question. You argue in your brief that the discreet question for purposes of finality was whether the termination be satisfied O'Brien. Yes. But this conception seems to take a particular question about a particular provision of the merger agreement and deem its own separate proceeding. So the question I have is, how does your argument square with the decision in Bullard where the Supreme Court rejected a conception of finality that sliced the case too thin? So are you slicing the case too thin? The court in Bullard was dealing with a different issue, I believe, Your Honor. Here the issue of finality was tremendous reliance that NextEra placed on that order. And it's really an issue for every party seeking to buy assets out of a bankruptcy case here in the Third District. Well, let me ask you this question just as a general matter. Isn't that true in any case? I mean, this particular case includes it's a bankruptcy. You spent some money in reliance, but doesn't that happen literally in every civil case? A judge, bankruptcy judge, district judge, magistrate judge makes a particular ruling. An order is entered. People rely on that. Not terribly different, Your Honor. I agree. And that's why the standard is there has to be manifest error of law or fact. It can't be just some minor issue that a year later a court can vacate the decision. You wouldn't say this is a minor issue, though, right? So I think we'd all agree it shouldn't be a minor issue. This isn't really a – can't be described that way, could it? Well, I think the mistake that the court describes at the end of the day was not something that would detract from approval under O'Brien of the bankruptcy. What the court said one year later was, I'm now confused as to what I ordered. But if one goes back and looks at the record, the O'Brien standards were clearly met. How is the court wrong in saying, oh, you know what, I didn't satisfy O'Brien or this doesn't satisfy O'Brien? One needs to go back, I think, and just examine the record and see whether O'Brien was satisfied and whether the judge's now confusion really amounts to manifest error. What it comes down to is the court said – and if you look at the transcript, he was very involved. He had the termination fee provision 8.5 of the merger agreement open before him. And he was actually asking the questions to the witnesses. I don't understand. In the context of reconsideration, I mean, that's the whole context. You know, I need to relook at this. So if I'm understanding your position, you want us to say to a judicial officer who has admitted in the public square, you know, I made a mistake. Not only did you not make a mistake, it wasn't as big a deal as you thought it was. And we're going to reverse you on the error you think as a matter that was as a matter of law as well as a matter of fact and just say, you know, you were wrong on both, so you were wrong twice. Is that the ultimate determination you're seeking us to make here? Your Honor, I think what we are asking is we look at the original record at the time, a year before, and see whether there was some basis for the judge a year later to say there was confusion. And if you look at the record, it clearly laid out the elements of the termination fee. The judge clearly applied the O'Brien standards. But what is bothering him now, a year later, and he refers to it six times in his opinion, is that now that the fee is payable, now he understands that under no circumstances would Nextera ever terminate it, thereby triggering the fee. Well, that was always a part of the testimony before the court. That's how it works. But he said Nextera never had an economic incentive. But he never explored that. And the record shows there could be economic incentives for Nextera to terminate. It wasn't the final order. He still had the option, did he not, to reconsider the order that's not final? Well, we don't concede it was not a final order. We think it was. This court uses a very flexible standard for determining final orders. But there was not an order terminating the bankruptcy. I mean, that's the bankruptcy case. No, I think the analysis, the specific order entered and the specific provision, because the Third Circuit does use a flexible standard, what the court said was my approval of the termination fee is without any further proceeding before or order of the court. So the intention was it's a final order. The parties can rely on it. They can go spend tens of millions of dollars because I will stand by my order. And a year later to pull the rug out from under a potential buyer and say, well, we know you thought you were getting a termination fee, but no. Isn't the problem that it was laid out in the merger agreement that if the debtor terminated the agreement to accept another proposal, the debtor would owe the money. But the anticipation was, well, the debtor is going to do that to get more money, to terminate it, to go for a higher proposal. And it wasn't in the focus of the parties, wasn't that the debtor would have to terminate in order to even move forward with a lesser proposal. Interestingly enough, the ordinary course is the debtor terminates for a higher offer. But the testimony before the trial judge was that may not necessarily be the case. The judge himself in his own language said it could be the alternative transaction could be a standalone plan, which means there's no cash, debtors get stock. So on day one, and that's not a requirement under O'Brien that there has to be a higher or better offer. The parties, these are sophisticated parties that highly negotiated the terms of this breakup fee. There were dozens of counsel involved. And in fact, the counsel for the trustee for the bonds that are now owned by Elliot said that his constituency thoroughly reviewed and vetted the provisions of the merger agreement. They were on board with it. Let me ask you this question. You say in your papers, you've stated here, we've spent tens of millions of dollars in reliance. But there's a separate proceeding right now seeking to obtain that money as administrative expenses, correct? Yes. So I'm not quite sure what role you think that the expenditure of money, other than saying, you know, we relied on it, should play in our consideration because you'll be able to, well, you'll at least be able to argue that they should be recovered as administrative expenses. The importance of suggesting there were huge expenditures of time and effort and money is the reliance issue, that parties need to rely on issues of the bankruptcy court. It's not that the amount, it's the principle that you get breakup fees, so you expend the time and effort to proceed. Well, and aren't you also going to argue that by virtue of your doing that, the next suitor who came along, although for less money, had the benefit of that work? Well, that is one of the bases of the motion, the separate motion in the alternative for a much lesser sum of money, $60 million. It's a bit of an apples and oranges. Nextera is here to get the benefit of its contract, a contract that all the parties were supportive of. Where does the litigation stand that the challenge is your right to any of this money based upon breach or whatever? That's a complaint that's been filed. It's been put in hiatus pending the termination by this court. But what's important is the timing, the fact that Elliott waited 10 months to bring the motion. They were a creditor at the time. They are sophisticated. They have counsel, and they continued to purchase bonds throughout the case. They now own over a billion dollars of these bonds. The debtor supported. It was Elliott, not the debtor. The debtor said this was negotiated. The debtor did. The debtor supported us on the motion for reconsideration. They said Elliott's attempt to set aside that order was Machiavellian, beyond Machiavellian. When the September 25th letter arrived at the judges' chambers, could the judge not have sua sponte reconsidered? Absolutely. And that's why one of the purposes of the letter was to clear up the misstatement that was made by counsel for the debtors at the end of a long day by this one-page letter, one-and-a-half-page letter, set out in black and white clearly how this fee worked. Elliott was around. They were a creditor. If they thought it was inappropriate, they should have moved to reconsideration at the time, not wait 10 months and to see if the deal closed. They loved the deal. The deal was hundreds of millions of dollars, better than any other bidder. They wanted to get the benefit of the deal, so they hung back, and they were opportunistic. Was it the only deal at the time? My understanding is that it was. It was. It was, Your Honor. Which would distinguish from an O'Brien or a Reliant fact pattern, would it not? No. The court in O'Brien said if it induces a bid and induces a bid that shows real value, that's an appropriate element. But wasn't there an auction? Weren't there other bidders around? It was a long history of trying to sell this asset. There was a prior confirmed plan with another bidder, which failed because it didn't get regulatory approval. But it was a very extensive process of professional investment bankers finding the best offer. Here's what I want to ask you about, the connection between the termination fee and thinking about O'Brien and Reliant. Yes. And it, I think, piggybacks on what my colleague was just talking about. So the termination fee provision, if it didn't promote more competitive bidding, if it didn't increase the value of the estate, how is it in compliance with O'Brien and Reliant? The court initially said there was overwhelming evidence that the breakup fee was necessary to induce NextEra to make the bid. NextEra was clear throughout the negotiations it needed that protection. It was heavily negotiated. NextEra increased its bid to get that breakup fee at that amount. So now the court, 10 months later, a year later, I don't know the exact term, now looks at that and says, I made a mistake in my analysis. And he says, I made both a mistake of fact and a mistake of law. Now, I think your point is, it doesn't matter to manifest error. I get that, although the law or fact is, I think, is disjunctive. So we can go either way. But what I'm trying to discern from you is, what is it about the manner in which he went about this? We say, you know, this is crazy, you're clearly wrong, and it demands reversal. The judge ignored the evidence on the record. As he said six times in his decision, it was based on the fact that NextEra would never terminate and force the debtor to terminate and trigger the fee. If you go back and look at the record, it's to the contrary. The record provides that the parties negotiated an issue that would relieve the economic pressure on the debtors. They agreed to split the interest costs. That was the primary concern of the judge, that the estate was incurring $50 million a month. In the agreement, in 1.7a, NextEra agreed to pick up half of that to relieve the burden on the estate if the remaining issue was the regulatory approval. There was additional pressure on NextEra to possibly terminate. Under the merger agreement, they had to reserve $9.5 billion to close the transaction. If they didn't, they would have been in breach. So there were economic incentives on NextEra to stick to the deal and try to get the deal done. But to say outright NextEra would never terminate, there was nothing in the record. That was pure speculation on the part of the judge. And that was the basis for his factual issue. His fact was NextEra would never terminate. There's nothing in the record. It was pure speculation. What is in the record… I thought it was that he didn't appreciate that there was a circumstance in which NextEra wouldn't terminate or wouldn't… But the debtor had to, basically, to pursue the… Yes. Well, he says payment of a termination or breakup fee when a court declines to approve related transaction, court or regulatory body, cannot provide an actual benefit to the debtor's estate sufficient to satisfy O'Brien. But isn't that a bit of Monday morning quarterback when he had analyzed at the outset that this provision is necessary to do the deal? It's a shame that it turned out that because the regulatory approval didn't happen, they had to terminate to pursue a lesser. But that doesn't… That kind of putting the cart before the horse when you say that, oh, I didn't satisfy O'Brien because look what happened. The point is at the time he made the ruling on approving… And I think O'Brien is distinguishable because in O'Brien, there was no initial approval of the fee. Correct. It was wait and see. Maybe I'll give it to you down the road. And down the road, it didn't benefit. Correct. Here, he's undoing an approval that arguably satisfied O'Brien. I could not have said it better, Judge. Is your primary challenge the judge abused his discretion to modify his own order or is it that it resulted in significant prejudice to you? It's an abuse of discretion standard, but where the abuse of discretion is based on the improper application of the law, this court can give it de novo review. And we feel he improperly applied the law to the O'Brien standard. The O'Brien standard was met and that didn't change over the course of a year. I'm happy to. Okay. So, I know I'm out of time, but… Relax. Oh, thank you. I don't want you to say anything at the moment, but relax. So, I know how excellent advocates are. They're like, oh, this is my opportunity to bring up that third issue, which I'm uninterested in at the moment, but I don't know about my colleagues. So, you argue in your brief that no authority holds that a bankruptcy estate cannot bear regulatory risk with respect to a termination fee. Yeah. But O'Brien does hold that a termination fee, to be allowable, it must be, quote, actually necessary to preserve the value of the estate. And so, I'm sort of grappling with the notion of risk and is it risk antithetical to, you know, what you're trying to achieve with regard to creditors debtors of bankruptcy estate? There is always a risk. Deals always have contingencies. This deal had a regulatory risk. All the parties knew about it. A prior deal had failed because of regulatory issues. But these are very sophisticated parties. We have Akin Gump representing the bondholders. We have Paul Weiss representing creditors on the other side. We have Kirkland representing the debtors. They were all part of this negotiation of a very complex 100-page agreement. And both O'Brien and Reliant, the other Third Circuit case, acknowledge that some deference has to be given to the creditors and the parties that negotiate this. It's not a business judgment standard. We understand that in the Third Circuit. We have O'Brien has to be administrative expense. But by the same token, the judges give some deference to the desires of the creditors. This had unanimous approval, the breakup fee. These had very sophisticated parties with hundreds of millions of dollars at stake who negotiated this and knew what they were doing. So to apply hindsight judgment a year later, because the estate is going to be hit with a $275,000 fee, a million fee, is totally inappropriate, as Judge Rendell noted. Parties relied on this. You come to the courts, the bankruptcy courts in the Third Circuit, you get an order, and you rely on that order in good faith. What kind of error would you have agreed that, upon reflection, take timeliness out? So what kind of error would you say, in this general circumstance, would have been appropriate for him to review? It would have to be an extreme error, manifest, where the parties had no understanding what was going on or almost amounting to fraud on the court. After a year and after all this reliance, it would have to be an extreme case, parties dissembling before the court. Okay, so turn that response on its head, right? So what misunderstanding would the court have to have operated under for you to agree that it was error, there was an error of law or fact? I'm trying to just sort of conceive of the, what you concede would be enough. I think what we've seen in some of the cases, if there was self-dealing, if there were undisclosed relationships, sharing of fees, untoward incentives that were not disclosed to the court, it would have to be a very serious offense that really offends the court. Right, but in your response to the hypothetical, you seem to be focusing on essentially new information, right, and not a new understanding. I'm trying to probe whether you'd agree that there's a circumstance or a situation where if you were under, if you as the court were operating under a misunderstanding, and then you had your voila moment or your aha moment, it would be permissible. I'm struggling to come up with a scenario where the facts were laid out, the court read the agreement, the court did the questioning of the witness, and got a letter summarizing the terms. It's hard for me to see a change of mind because now the estate was being socked with a big fee. Well, maybe only if the court was told over and over again, this is only payable if next error terminates. This is only payable if next error terminates. If the debtor terminates, this isn't payable, this isn't payable, this isn't payable. But that's not our facts. It specifically says that if the debtors terminate following the entry of the order to accept another proposal and it's consummated, they owe the 275. The court even says, and if the deal falls apart, if they don't get the regulatory approval they need, the deal falls apart, they confirm a different plan, it would be payable. I believe so. Exactly. It's not that fact. The court understood it at the time. I come back to the situation that if someone came in with a $25 billion offer after this deal failed, no question, that fee gets paid. You write that check. Correct. But no one, everybody assumed that's what happens. The debtor, oh, I got a better deal. Bye. See you next error. I mean, that's what's in everyone's contemplation. It may be, but in fact, in that very dialogue that you read from, there's a reference to a standalone plan. The alternative plan could have been a standalone plan, which by its nature, there's no cash. They get a stock and a reorganized company. Not nearly as good. Would you take the position that if the bankruptcy court, in its initial determination, said that there should be no termination fee, that that would be error? Well, I'd have to understand on what basis he was disapproving under O'Brien. That's kind of O'Brien. That's O'Brien. To not allow it initially. Yes. Of course, that's because there were other suitors. That was going to disincentivize other debtors. Well, in this case, it met the O'Brien test because it incentivized NextEra to make a bid that was hundreds of millions of dollars higher than any other bidder. And do away with the match right. Do away with the match right, which NextEra insisted upon until the very end when they were forced to give that up. A very valuable aspect. Thank you. Thank you, Your Honor. Just one moment. Just one moment. Just one moment. Good morning. Good morning. May it please the court, Doug Hallward-Dreemeyer, on behalf of Elliot. Go ahead, sir. I think that we need to focus on the fact that whether a proposed termination fee satisfies the statutory test of 503B, such that it is necessary to presume that there is no termination fee, of the estate is a question that is committed to the discretion of the bankruptcy court. This is not an administrative fee case. O'Brien was an administrative fee case. In O'Brien, there was no promise as part of the deal that there would be a breakup fee. So the judge said, catch me later, maybe I'll give it to you. So it came to the court as an administrative fee. This is factually distinct from that because there is a deal that was approved by the bankruptcy court with a specific provision in it. And that was not decided as an administrative fee. That was decided right under O'Brien. The judge said the percentage is right. The amount is supported by the market. It's necessary to induce. It's been a piece of the deal from day one. They walked away from the match right. I mean, he fulfilled O'Brien at the time he was asked to approve this. So you're not talking about an administrative cost or expense here. To the contrary, I think that what O'Brien establishes is that when even in the first instance, the debtor comes forward and asks for the court to approve a termination fee, the court has to analyze that under the rubric of 503B. And does it satisfy the test that its payment is necessary to preserve the assets of the estate? All right. Well, then I'll take your, I'll posit that that's correct. I don't agree with it, but I'll posit that's correct. That's really what he did when he was asked to approve the merger agreement. Is this valuable to the estate? And he said yes. They're going to walk away if they don't get it. They waived the match right. There's nobody else waiting in the wings. This is value, right? He did, but he did so on the basis of a fundamental misapprehension of the agreement that he was. Where is the fundamental misapprehension? The fundamental misapprehension was about the circumstances in which the fee would be payable. Well, I'm reading a statement that he made. Because if this plan gets confirmed for the debtors and not because of anything the debtors do wrong, they don't get the regulatory approval they need, this falls apart, and a year and a half from now they confirm a different plan that's not even a sale plan, say it's a standalone plan, that breakup fee would be payable. I believe so. And then your Honor's quoting from pages 534 to 535. On page 539, the witness, Mr. Hiltz, says, I'm incorrect in my statement earlier. And then the court goes into further colloquy with Mr. Hiltz. And then Mr. Huznik starts to speak to the court about this, and the court says, I got that wrong, didn't I? Twice after the colloquy that your Honor refers to, there is further confusion. I misstated that. I got that wrong. This is something, this is not after the fact. What was the misapprehension? The misapprehension was about whether in the circumstance in which the PUP denied approval and the debtor didn't terminate in order to pursue a better agreement, but rather terminated because NextEra was simply able to bide its time and wait it out while the debtors were expending $50 million a month. There was no end date by which it had to happen. That instead of preserving the estate's assets, that was a recipe for wasting the estate's assets. And the court didn't understand that. And the court didn't understand it precisely because, as I said, the court went back to this several times repeatedly. I don't understand this.  And then they get into a colloquy. Well, then that's why they sent the September 25th letter, which clarified it. Well, Your Honor, at the September 19 hearing, which is the record on which the court entered the order approving this, Mr. Husnik, for the debtor, stood up because, again, there had been so much confusion, repeated references. I got that wrong, didn't I? Mr. Husnik stood up to say he wanted to clarify the break fee. It's an incredibly detailed provision. He said, suffice it to say, there's no breakup fee if the PUCT just denies, outright denies approval. And notably, the PUCT itself understood it the same way. But how did the September 25th letter not clarify the instant situation and make it clear? Because the PUCT approval letter does say that the payment will be due if the debtors terminate. But then it references to pursue another deal. And all of the references up to that point, in which they talked about the payment being due, were references in which the debtors terminated to pursue a better deal, a superior deal. That wasn't stated either way. It had to be understood that if the debtor wanted to pursue some deal, there was no statement that, oh, it's only if they pursue a better deal. I get back to the fact that that is the real problem here. But no one said it's only if it's a better deal. Maybe it was in somebody's contemplation, but that doesn't mean... But it wasn't just in the judge's subjective contemplation. It was in the motion. The motion had talked about terminating to pursue a higher or better offer. Mr. Horton's proffer at the hearing had talked about there was a low possibility that this would ever be payable. But it would only be if because in the exercise of the fiduciary duty to the creditors, the debtors sought to, another quote, hire and better offer. That's not what the agreement says. It says, accept another proposal. And that is consummated. The debtor would owe the $275 million. That's the approval motion. This is a document that was over 100 pages long. And that was, in counsel's own words, incredibly detailed. But there's a lot of great lawyers, as your opponent noted. There's a lot of great lawyers who could have put in there to accept a higher deal. But that's not there. Again, if we go back to the point, and both Reliant and O'Brien make clear that the determination by the court whether to pay a termination fee under the standard of 503B is a matter for the discretion of the court. Both review and affirm the decision not to pay a fee as not an abuse of discretion. The court can only exercise its discretion if it has before it a clear understanding of the circumstances in which the termination fee was obtained. You're saying at the time of the approval of the merger agreement, the court should have refused to approve the deal. Yes, Your Honor. And twice in the opinion on reconsideration. On what basis would it have refused to approve? It would have refused to approve it. And it says twice on A16 and A45 that it would have refused to approve had it understood at the time that this was set up in a way that it created an incentive on the part of Nexterra to delay and drag out the process in order to force the debtors to terminate and pay the fee. But wouldn't it then have been the court been wrong in refusing to approve the deal? Because then Nexterra would have walked? No, Your Honor. What would have happened? I mean, look, it's always the case that bidders come forward and they say, I'm only going to bid if you offer a termination fee. They said it in O'Brien, and the court called their bluff. And you know what? In the end, after the court called its bluff, the bidder came back. Same thing happened in Reliant. They said, we'll only do this if you pay a termination fee. In this instance, the court would have been able to say, look, I will approve a termination fee. In the end, it did approve a termination fee. It was just as to a narrow circumstance that it didn't. It approved a termination fee again in the Semper deal. The court would have approved a termination fee, but not if the reason that the debtors terminate is because the PUCT has denied. Let me ask you this question. Is your position that there's nowhere in the record that one could see or infer that the termination fee was linked to the PUCT approval? I'm not saying that it was impossible to discern. What I'm saying is that the court, who is the one who has to exercise the discretion whether to approve this or not, was totally focused on this. Why? Because there had already been one regulatory rejection. And he wanted to know, what are the circumstances in which this is going to be payable? Went back to it several times. And at the end, in order to clarify that very confusing record in which both witnesses and the court were saying, I got that wrong, didn't I? Counsel for the debtor said, to clarify this incredibly detailed provision, suffice to say, there's no breakup fee if the PUCT just denies, outright denies. And that's at JA 547. Can I get back to the September 25th letter? If there was a confusion then, why didn't the September 25th letter? And don't you think between the time of the approval and the sending of that letter, counsel were really focused on this and it was the deal. No, the September 25th letter does not clarify this. Counsel here repeated a statement in their brief that this provision was designed to shift regulatory risk onto the debtor. That succinct statement was never made to the bankruptcy court. In fact, they said the opposite. Quite a statement that the judge made. There's no breakout fee if the Utilities Commission denies approval. Any objection to that statement? I mean, this was in court, open court. This was in open court, and NextEra was sitting there watching it. And if they thought, if they thought the entire purpose of this provision was to shift regulatory risk, they would have jumped up and said, Your Honor, just to be clear, no, no, no. If the PUC denies, we get our fee. This is exactly what happened. This is exactly what happened. So the circumstance in which the counsel, to clarify the record for the court in the exercise of its discretion, said it will not be payable is now the circumstance in which they're trying to collect it. Any objection at that point to the statement? There was no objection from NextEra, though they were sitting there, and the court observed this. Were they persona non grata at that hearing? No, they were not. They were there, represented. Their representation is reflected in the transcript of the hearing. And the suggestion that they could not have said something, I think, is belied by the fact that just a few days later, they submitted a letter to the court in a purported attempt to further clarify. But the letter, again, doesn't clarify. One thing that is notable about all of the circumstances in which they talk about the fee being payable, it's always if the PUC denies and NextEra, I mean, not payable. All the circumstances where they say the fee would not be payable, it's always if the PUC denies and NextEra terminates. If the whole purpose of this provision was to shift regulatory risk to the debtors, you would never say that. It's implicitly misleading to suggest over and over and over again that if the PUC denies and NextEra walks, no fee payable. Well, but everybody understood. I mean, the debtor even agreed that this fee was payable in this instance. Everybody understood it. The fact that the judge didn't appreciate this nuance, that's a basis for a year later saying, oh, guess what, I'm undoing this. What does that do to the reliance of people on the agreements? The debtor said, this is payable. It's just Mr. Elliott who said. It's the judge's understanding that matters because it is the judge and the bankruptcy judge alone who has the discretion to make this determination. It's reviewed for abuse of discretion. The judge who has a statutory obligation to help preserve the estate is looking at this. In this circumstance here, when he finally came to understand it, was designed in a way not to preserve the estate's assets, but to waste them. Because NextEra, if it was rejected, was not going to walk away. It had no incentive to. Well, but there was value even to approving the breakup fee if they had to go to another suitor. Because what NextEra did was a lot of due diligence and a lot of poking the tires that would have been valuable in inducing someone else to come in. Your Honor, that was certainly not the basis on which this fee was proposed or approved. Well, that's the basis on usually with breakup fees, as well as to compensate. It is often the case, Your Honor. And if that was the argument that had been made to the judge and the judge had approved, arguably, he could have approved it. And I say arguably because that is the word that this court has used both in O'Brien and in Reliant. What NextEra comes before the court and asks the court to do is establish a categorical rule that the next time a provision that looks like this is presented to a bankruptcy court, that court must approve the termination fee. Must, because it would be an abuse of discretion, because it would be an error of law not to approve it in that circumstance. That's the argument that NextEra comes to make. Isn't it a much more narrow argument? Isn't it the real argument that as we, this is them speaking, as we look at this problem, the error that the judge identified doesn't amount to an error that under these circumstances, a court should review and approve? Isn't it that, you know, parties rely on the court's understanding of a agreement, whether it's simple or complex? And if there was a misunderstanding about this particular one, we don't understand how that could happen. But that isn't sufficient for taking a look at it again and overturning it. You accurately summarize their argument. But to suggest that we don't understand how the court could have been confused when Mr. Husnick stood up after a lot of confusion was evident in the record and said, to clarify this incredibly complicated provision, suffice it to say, it would not be payable if the PUP outright denies. And that is the opposite of the case. And if that were true, we wouldn't be here because no fee would be payable. And the debtor has to terminate, did he? No, he did not. So that was an incomplete, that was still an incomplete statement. It was a statement, again, in a context that was very confusing. And the court made clear this was central to his decision that simply didn't provide the court with the necessary information. And again, their argument requires this court to conclude that the bankruptcy court would have committed an error of law not to approve the fee, even if it had properly understood it. But I wanted to point out that in both Reliant and O'Brien, the language that they cite in Reliant as though it established a test. And if this test is met every time, the bankruptcy court must approve. That sentence starts with the words, we recognize it could be argued that either or both ways could have preserved estate assets. Could be argued, could preserve estate assets is not the way this court announces a rule of law that bankruptcy courts must approve in subsequent instances. This is a matter that is still committed to the discretion of the court that knows the facts of the case inside and out. I do want just very quickly, because there were questions about interlocutory versus final, to point out that as your honor references, this was not final under the standard articulated in Bullard. Because there was more to be done, and that was to allocate. In an analogous district court context, if there's a judgment that establishes liability to the plaintiff, maybe even establishes the total amount of the plaintiff's damages, but does not allocate that injury among the defendants. If that allocation is anything more than a ministerial duty, if it calls for an exercise of judgment by the court, that is not a final appealable order yet. And your honor, Judge Fuentes, you wrote that in the case of Capuccio versus prime capital funding, 649 F third 180. That's from 2011. And what Bullard says is those same concepts of finality apply in bankruptcy. They may apply to more discrete issues, but here the issue about the termination fee was not final. So it was still an interlocutory order. We don't even have to satisfy Rule 60B. But if you get to 60B, it certainly is not 10 months, as NextEra liberally throws around. Elliott was not even a creditor of these estates, these debtors, at the time of the September hearing. Elliott, when it became aware of the circumstances in which this fee would be payable, and what the incentives were for NextEra to drag this out, as it did in May, when it not only sought reconsideration, but asked the PUC to delay for 45 days. It's ruling on that reconsideration motion. Elliott raised the alarm. Are you saying Elliott didn't have standing? What's that? Are you saying Elliott didn't have standing? In September of 2016, when Elliott was not a creditor, it did not have standing. How did it have standing later on? Because it had subsequently acquired interest. The question, even if you're talking about under Rule 60B, is whether they acted, if it was not reasonable. That question as well is reviewed for abuse of discretion. NextEra argues that it's a rule of law. They cite a case, Albright, which was about a rule of law, the interplay between Rule 6 for counting days and the timeliness of a Rule 59 motion. But where it's a question of reasonableness, timeliness as reasonable, the case they cite, in Ray Olick, says that's reviewed for abuse of discretion. And here, as soon as Elliott became aware, after it had acquired a substantial sum of the obligations in the March-April time frame, that this was going to happen. Can you have abuse of discretion if the other side has invested a lot of time and money in order to pursue its rights? Your Honor, that's precisely the inquiry that the court undertook. And here it said that as between the interests of justice and the reliance interests, that NextEra's reliance interests really were undermined by the fact that it was present at that hearing. That what it claims was a provision written to shift regulatory risk onto the debtors was not explained that way. And precisely the opposite was said. NextEra did not clarify it. And so when NextEra understood that the record was that unclear, that its reliance interests were less. And that the interest of the court, and really I think that that's what's so important here. We're talking about a court who had to make this difficult decision and found out later on that the fundamental premise of its decision was wrong. And it was wrong, not because it had missed it. Not because it had failed to ask. But it was wrong because it asked and asked and asked. And the answer it was given was incorrect. Thank you, Your Honor. Thank you. Good morning, Your Honor. For the record, Mark McCain of Kirkland & Ellis on behalf of the Appellee Debtors. Judge Greenaway, I want to go to a question that you specifically asked. Which was, what type of mistake would be necessary to rise to the level that needed to be revisited? And I think specifically in this case, it's because Judge Sanchi, when he realized there was a mistake, it was the but-for cause. It was the determining factor on whether this termination fee satisfies O'Brien and 503B or does not satisfy O'Brien and 503B. Now, you're switching gears. You supported the payment of this breakup fee because it was negotiated between you and the purchaser. It was in the merger agreement. It was well understood. It was in the record. You clarified it with the September 25th letter. Nobody moved for reconsideration. Why are you here urging us to do that? Your Honor, consistent with Reliant, the debtor's actions in Reliant, the debtor here did not know that Judge Sanchi made a mistake. He came forward and said something that we could not have appreciated at the time, which was he had a misunderstanding of the record. The debtor in Reliant concluded, I have to switch sides because I need to protect the estate. And I have a fiduciary obligation to protect the estate. So, too, here we have a fiduciary obligation to protect the estate. When Judge Sanchi came forward in September and said for the first time, I did not understand. This is on me. We have to recognize in that circumstance based on what he said and concluded, which was this does not preserve estate value. We need to support Judge Sanchi's decision because he found this does not satisfy 503B preservation of the estate because of the circumstance where he didn't disallow the termination fee. He trimmed the triggers in which it would be satisfied. Do you not agree, though, that Reliant is a different situation? That this case is all about what has to be before a court when it approves a breakup fee as part of a merger agreement? And the judge went down all of the factors that are necessary in O'Brien as to the number, the amount, that the breakup fee was necessary. It's clear it's been part of a piece of the deal. They walked away from the match right. This is of value. And that wasn't the situation in Reliant, was it? No, Reliant is different. I acknowledge that. And to be fair, O'Brien, as much as it establishes that we need to look at those factors, it's still rooted in the court and in the code, which is 503B, which is ultimately does this payment of this fee, a fee that's only paid in a circumstance when a transaction fails, does this preserve the estate? And what Jasanti came forward and concluded is in this very narrow circumstance, when you have a situation where the regulator has denied it, where you have a terminable date but not a termination date, where both of the parties have the ability to terminate, and where the debtors have a burn rate, or in other words, they're accruing cash obligations for secured claims of $50 million a month, and that was known by the court at the time, knowing that circumstance, in other words, that the debtors can't stay in bankruptcy forever, and that staying in bankruptcy is going to deplete the estate. And finally, to your point, Your Honor, it's been made a couple times, when any alternative transaction would trigger the fee, right, when you add up those building block components, Jasanti concluded, I cannot say that triggering the fee in that circumstance would preserve estate value as opposed to diminish estate value. And so that's when you look at what Jasanti did last September and how narrowly he edited the termination fee in paragraph 5B of that order. He specifically said, in this narrow circumstance, I do not believe I could conclude that this preserves estate value. And we as the estate fiduciaries have to defend that. Can you cite to me any case that would be precedent for what was done here? Your Honor, I think really there are only three cases in this area where I think you have O'Brien. O'Brien and Reliant were different. There was no pre-approval. So you have to set those aside. Then you have to go back to the code and say that was the core finding in O'Brien, that we can't rely on business judgment. We have to go back to proving this transaction. This didn't make value to the estate, which is what he found at the initial approval. Exactly right. And the challenge was he came forward and said, I misunderstood the facts. I misunderstood this critical situation. And then that's what we've highlighted. The best I can do, Judge, and it's not a well-articulated decision, is in 310 Associates, it was a Second Circuit procurium decision. A bankruptcy court looked back and said, I am using 6DB on my own to revisit a bitter situation because of circumstances that the court didn't know about and that the debtor didn't appreciate. That's as close as we get. Except here the debtor did appreciate. The debtors put forward what they thought was the record. That's why we defended it below. What we could not have appreciated at the time is that Judge Sanchi had that misapprehension. Okay. If you're honest, I don't have any other questions. Thank you. Thank you. Howard Seib for the Appellant. When I started my remarks, I commented this was an extraordinary decision. I think what we heard from Elliott's counsel today was an extraordinary admission. They said they did not have standing at the time this order was entered, the order approving the bankruptcy, and somehow they have standing now because they bought bonds and debt in the estate. I would think by buying the bonds, the bonds by the very trustee who stood up in court and said, our constituency has examined the merger agreement in great detail and we support it. I'd suggest he's bound by the determination, number one. So an extraordinary admission on their part on the standing issue. Secondly, we did not hear from counsel for Elliott any explanation whatsoever why they waited 10 months to bring this motion. They knew NextEra was working hard on this transaction. They knew they were expending tens of millions of dollars. Why did they wait? They waited because they liked the deal. Let me ask you this question. I asked counsel whether you all were essentially persona non grata at the hearing, and he said, no, they weren't. First of all, do you agree with that? And then assuming you weren't, then why didn't you take it upon yourself or whomever stood in the stead of NextEra, take it upon themselves to make that point that there's no breakup fee. I'm sorry, that the breakup fee would come if there was no, could come if there was no PUC approval. NextEra counsel was present in the courtroom along with dozens of other attorneys. This was a motion brought by the debtors. It was their burden and duty to get it approved by the court. They needed authority to enter into the contract. Kirkland had eight lawyers there up at the bench. Presumably if they thought there was an error, they would have corrected the record. We were in attendance. Presumably we could have run up and interrupted the proceedings and said, I think we heard a misstatement. We did not do that. What we did do with the debtors six days later, once we saw the transcript, wrote a letter to the judge. And said, judge, I want to make it crystal clear the provisions of this termination fee. It's paid here. It's not paid here. And the judge had a hearing, read the letter, and said, I understand that. And he also said, I understand when breakup fees are payable, it's going to cause harm to the, it's pain to the creditors. It's coming out of their pocket. The judge understood that. That's how breakup fees work. And he acknowledged that. What's the language, just for the record, what's the language in the September 25th letter that most crystallizes this point that it was made clear to the court? Yes, that's the joint appendix at 702. And that is the fourth paragraph at the bottom. In other words, the $275 million termination fee is triggered if EFH, the debtors, terminate the merger agreement as a consequence of the commission not approving the merger agreement. It's right there. Where was Elliott? They didn't like it. When they bought their bonds, they were already bound by the record. This is a statement that was made by a letter to the judge or a statement that was made by the judge? This was a letter to the judge by NextEra. Did the judge at any time disavow the statement that he made that there is no breakout fee if the commission does not approve the transaction? The judge at the hearing, where he discussed this letter, said late last evening, EFH and NextEra sent a joint letter to the court regarding the termination fee. In that letter, the parties clarified their position with regard to the termination fee. No one ever talked about better alternate proposal, worse alternate proposal. No, in fact, the judge... They would only terminate for a better proposal. That was not a mistake of fact? That if they had to terminate and then they were desperate and went for a lesser proposal and then this fee comes up and the debtor is really struggling? No, the court did not cite the alternative transaction criteria in his opinion. And in fact, when he questioned the witness, the judge himself said it could be a stand-alone plan, which clearly is not as good as a cash $9 billion check that would be coming to the creditors. So you're saying he did anticipate a more dire circumstance? He did. Okay, thank you. Thank you, Your Honor. Thank you all counsel on a well-argued case. We'll take it under advisement.